**OFFICE COPY**

HERRICK, FEINSTEIN LLP
John R. Goldman (JG-4550)
Grant R. Cornehls (GC-6123)
2 Park Avenue
New York, New York 10016
(212) 592-1400
Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

APPLETON ACQUISITION, LLC, as successor in
interest to Kevin Loughlin, Fred Remark, Herbert
Barron, Charles Frank, Wayne Benson, Joe Batteiger,
Henry Bloch, Sam Cacciatore, Reynolds Jensen, Marie
Torpey, Charles Tuckman, Anthony Cicchetti, Ernst
George Tiegel, Ernest Cook, Mohammedan El-
Tobugi, Lester Dulitz, Ann Planck, Griff & Eugenia
Lee, Joseph Greeley, Ralph & Constance Tiegel,
George Byrd, David Boyd, Morton Engelberg, Donald
Bryan, Frank Kinnett, Bruce Goodman, and Albert M.
Iosue,

                           Plaintiff,

       -against-

NATIONAL HOUSING PARTNERSHIP, AIMCO
PROPERTIES, L.P., and APARTMENT AND
INVESTMENT MANAGEMENT COMPANY,

                       Defendants.

----------------------------------------------------------------- x



JUDGE KRAM

05 CV 4678

CIVIL ACTION NO.

RECEIVED
MAY 13 2005
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff Appleton Acquisition, LLC ("Plaintiff"), as successor in interest to Kevin

Loughlin, Fred Remark, Herbert Barron, Charles Frank, Wayne Benson, Joe Batteiger, Henry

Bloch, Sam Cacciatore, Reynolds Jensen, Marie Torpey, Charles Tuckman, Anthony Cicchetti,

Ernst George Tiegel, Ernest Cook, Mohammedan El-Tobugi, Lester Dulitz, Ann Planck, Griff &

Eugenia Lee, Joseph Greeley, Ralph & Constance Tiegel, George Byrd, David Boyd, Morton

Engelberg, Donald Bryan, Frank Kinnett, Bruce Goodman, and Albert M. Iosue (collectively, the "Limited Partners"), by and through its undersigned attorneys, hereby files this Complaint against Defendants National Housing Partnership ("NHP"), AIMCO Properties, L.P. ("AIMCO Properties") and Apartment and Investment Management Company ("AIMCO") (collectively, "Defendants"). In support of its Complaint, Plaintiff avers as follows:

## Nature Of The Action

1.      This action arises from a scheme conceived of and implemented by Defendants to acquire the interests of the Limited Partners in a real estate limited partnership for less than fair value.[1]  Pursuant to this scheme, defendants represented to the Limited Partners that the partnership was operating at a cash deficit, that there were no means available to reverse the partnership's operating deficit, and that the partnership would be unable meet its debt obligations.  Defendants failed, however, to disclose that the property owned by the partnership was eligible for rental subsidies under a federal government program which would have significantly increased the revenues available to the partnership.  Defendants further failed to disclose that increases in the market value of the property and decreases in interest rates made it possible for the partnership to refinance its existing debt obligations (which would have resulted in a significant decrease in the partnership's operating costs) or sell the property to a third party. In addition, defendants breached their fiduciary duties to the limited partners by: (a) failing to take advantage of the rental subsidies available under the federal government program; and (b) failing to explore the possibility of a refinancing or sale of the property.

2.      The limited partnership at issue is known as "Beautiful Village Redevelopment Company Limited Partnership" ("Beautiful Village" or the "Partnership").  Beautiful Village is a

---

[1]      Plaintiff has acquired the Limited Partners' interests, including the claims against Defendants asserted herein, pursuant to separate written purchase agreements between Plaintiff and each of the Limited Partners.

single purpose entity, which owns a multi-unit, federally subsidized, low-income rental housing project located on the Upper East Side of Manhattan (the "Property" or the "Project").

3.      The Limited Partners are former limited partners of Beautiful Village. Defendant NHP is the general partner of the Partnership. Defendants AIMCO Properties and AIMCO both control and beneficially own NHP.

4.      The transaction at issue is a merger in which the Limited Partners and other Beautiful Village limited partners exchanged their Units of interests in Beautiful Village for Units of interest in AIMCO Properties worth $100 (the "Merger").

5.      At the time of the Merger, the Partnership was allegedly operating at a cash deficit, which was being covered by advances from AIMCO Properties under an interest bearing, unsecured line of credit (the "AIMCO Properties Loan").

6.      Those Limited Partners who voted in favor of the Merger did so in reliance upon Defendants' representations set forth in a written Proxy Statement. Among these representations were (i) that there were no means available to reverse the Partnership's operating deficit and meet its debt obligations to AIMCO Properties; and (ii) that the Merger consideration represented the fair value of Limited Partners' interest in the Partnership. Approval of the Merger required the vote of more than 51% of the limited partnership interests. Because more than 51% of the limited partnership interests voted to approve the Merger, the remaining Limited Partners were forced to accept the terms of the Merger.

7.      The Proxy Statement also contained the thinly veiled threat that in the event the Merger was not approved and consummated (i) AIMCO Properties would exercise its default remedies under the AIMCO Properties Loan; (ii) NHP would not contest AIMCO Properties' claims, but would instead deed the Partnership's Property to AIMCO Properties in satisfaction of

the AIMCO Properties Loan; and (iii) the Beautiful Village limited partners would then face significant federal tax liabilities.

8.     Since the Merger, the Limited Partners have learned that many of Defendants' representations made in the Proxy Statement were false and misleading.

9.     Among other things, the Limited Partners have learned that the Partnership's operating deficit could have been transformed into a substantial surplus by taking advantage of a federally sponsored subsidy program known as the "Markup-to-Market Program," which permitted the Partnership to significantly increase its rents.

10.     Defendant NHP, the Partnership's general partner, never took advantage of the increased rental subsidies offered by the Markup-to-Market Program prior to the Merger.  In fact, Defendants never even advised the Limited Partners of the existence, availability, or effect of the Markup-to-Market Program on the financial condition of the Partnership in the Proxy Statement or other offering materials pertaining to the Merger.

11.     Since the Merger, the Limited Partners have also learned that the availability of the Markup-to-Market subsidy greatly increased the market value of the Project.  Based on the Project's enhanced market value and the decrease in market interest rates, the Partnership would have been able to refinance the AIMCO Properties Loan at a significantly lower rate of interest (which would have significantly decreased the partnership's operating costs) or sell the Project outright to a third party as an alternative to the Merger.

12.     Under either scenario, the AIMCO Properties Loan would have been satisfied and the net return to the Limited Partners and the other limited partners would have been substantially greater that the amount they received in the Merger.

4

13.   Defendants never advised the Limited Partners that the availability of the Markup-to-Market Program significantly increased the market value of the Project and correspondingly increased the value of the Limited Partners' partnership interests.

14.   The end result of Defendants' wrongful conduct is that the Limited Partners (and other limited partners) were duped into transferring their interest in the Partnership to AIMCO Properties at a grossly unfair price.

15.   Plaintiff believes, and therefore avers, that the value of the Limited Partners' Beautiful Village interests was significantly greater than the consideration they received under the Merger.

16.   In this action Plaintiff seeks both legal and equitable relief in the form of damages, including punitive damages and/or rescission of the transfer of the Limited Partners' Partnership interests pursuant to the Merger based on Defendants' (i) violation of the federal securities laws; (ii) fraud and misrepresentation; (iii) negligent misrepresentation; (iv) breach of fiduciary duty; (v) breach of contract; and (vi) and aiding and abetting breach of fiduciary duty.

## Jurisdiction and Venue

17.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, in that certain of Plaintiff's claims arise under the Constitution, laws, or treaties of the United States, namely, 15 U.S.C. §§78a-78mm.

18.   This Court has supplemental jurisdiction over Plaintiff's remaining claims because they are so related to the Plaintiff's federal claims that they form part of the same case or controversy.

19.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Defendants may be found in this District.  Venue is also proper in this District

pursuant to 15 U.S.C. §78aa in that Defendants are found in, are inhabitants of, and/or transact business in this District.

## The Parties

20.     Apple Acquisition, LLC is a New York limited liability company and the successor in interest to the Limited Partners.  The Limited Partners are each natural persons who invested in limited partnership interests in the Partnership.

21.     NHP is, upon information and belief, a limited partnership organized and existing under the laws of the District of Columbia, with its principal place of business located at Colorado Center, Tower Two, 2000 South Colorado Boulevard, Denver, Colorado 80222.

22.     AIMCO Properties is, upon information and belief, a limited partnership organized and existing under the laws of State of Delaware, with its principal place of business located at Colorado Center, Tower Two, 2000 South Colorado Boulevard, Denver, Colorado 80222.

23.     AIMCO is, upon information and belief, a corporation organized and existing under the laws of the State of Maryland, with its principal place of business located at Colorado Center, Tower Two, 2000 South Colorado Boulevard, Denver, Colorado 80222.

24.     Upon information and belief, NHP has at all relevant times been a wholly owned subsidiary of AIMCO Properties.

25.     Upon information and belief, AIMCO Properties has at all relevant times been owned and/or controlled by Defendant AIMCO.

26.     Upon information and belief, Defendant AIMCO has at all relevant times been a self-administered and self-managed real estate investment trust engaged in the ownership, acquisition, development, expansion, and management of multi-family apartment properties. Upon information and belief, AIMCO is one of the nation's largest owners and managers of

multi-family apartment properties, operating throughout the United States, including the State of New York.

**Background**

**A.    The Partnership and Its Partners**

27.    The Partnership was formed on or about September 27, 1978 under the laws of the State of New York under the name of NHP Villa Associates for the purposes of redeveloping, owning, and operating the Project.

28.    The Project is a 272-unit apartment community comprised of three buildings located at 9-11 and 21 East 107th Street, New York, New York 10020, and is currently operating under the name of Villa Hermosa Apartments.

29.    The Project is encumbered by a forty-year mortgage note secured by a deed of trust on the Partnership's fixed assets and insured by the Federal Housing Authority (the "FHA").

30.    Upon information and belief, there were originally two general partners of the Partnership, NHP and National Realty Systems, Inc. ("NRSI"). Upon information and belief, NHP subsequently acquired NRSI's general partnership interest in the Partnership.

31.    Upon information and belief, 5% of the interests in the Partnership are held by the General Partner, with the remaining 95% of such interests held by the limited partners. Upon information and belief, prior to the Merger there were 33 Units of limited partnership interest in the Partnership, which were held by 26 limited partners.

32.    Each of the Limited Partners purchased Units of limited partnership interest in the Partnership at a price of $77,600 per unit and held his or her Units of limited partnership interest at the time of the merger.

**B.**   <u>The Limited Partnership Agreement</u>

33.   The terms and conditions of the Partnership are set forth in a written limited partnership agreement (the "Limited Partnership Agreement").

34.   Among other things, the Limited Partnership Agreement grants NHP the sole power and obligation to manage the Partnership and control its business.

35.   The Limited Partnership Agreement expressly obligates NHP to "take any and all action which may be necessary or appropriate to perfect and maintain the Partnership as a Limited Partnership under state law . . . and to develop, maintain and operate the Project in accordance with . . . applicable Federal, State and local laws."

36.   The Limited Partnership Agreement goes on to provide that "[t]he General Partners shall at all times exercise their responsibilities in a fiduciary capacity . . . ."

37.   The Limited Partnership Agreement contains express provisions regarding dealings with affiliates of the General Partners.  In that respect, it provides, in pertinent part, that "any transaction by the Partnership with Affiliated Persons shall be subject to NHP's approval, and (2) shall be on terms reasonably competitive with those which may be obtained from unaffiliated persons . . . ."

**C.**   <u>HUD's Section 8 Program And The Partnership's HAP Contract</u>

38.   The Project is a "Section 8" subsidized housing project, which receives subsidies provided for under Section 8 of the Housing and Community Development Act of 1974.  Section 8 housing assistance is the primary means through which the Department of Housing and Urban Development ("HUD") "aid[s] low-income families in obtaining a decent place to live and . . . promot[es] economically mixed housing."  42 U.S.C. §1437f(a).

39.   Under the Section 8 Program, the federal government provides supply side, project-based subsidies.  These subsidies, which are paid to the to the owner of the project, rather

than the tenant, cover the difference between what tenants can afford to pay -- up to a maximum of 30% of household income -- and HUD's estimated fair market rent for the unit.

40.     The terms and conditions of a housing project's Section 8 subsidies are set forth in long term (typically twenty years) "Housing Assistance Payments" contract ("HAP Contract") between the property owner and the FHA.

41.     Upon expiration of a HAP Contract, Section 8 property owners have the option of renewing the contract or opting out of the Section 8 Program.  If the Section 8 Program property owner chooses to opt out of the Program, it is permitted to set rents to prevailing market rates.

42.     Upon information and belief, the term of the Partnership's HAP Contract was from August 1, 1979 to April 30, 2000.

**D.     HUD's Markup-to-Market Program**

43.     HUD's Section 8 Program went into effect in 1974, and the first of its Section 8 HAP Contracts began expiring in the mid-1990s.  In certain metropolitan areas where Section 8 fair market rent ceilings had fallen below prevailing market rates, Section 8 property owners increasingly decided not to renew their respective HAP Contracts.

44.     In response to these circumstances, HUD introduced an emergency initiative in or around June 1999, which came to be known as the Markup-to-Market Program.   The purpose of the Program was to preserve the availability of below-market Section 8 multi-family housing by offering economic incentives to the owners of such projects to remain in HUD's Section 8 Program.

45.     The Markup-to-Market Program was later codified as revisions to the Multifamily Assisted Housing Reform and Affordability Act, 42 U.S.C. §1437(f) (2000).

46.     Under the Markup-to-Market Program, owners of Section 8 housing projects who remain in the Section 8 Program are able to "mark up" rent levels to market rates and distribute the increased cash flow resulting from such rents.

47.     In order to obtain the economic incentives offered by the Markup-to-Market program, property owners are required to renew their respective HAP Contracts for a minimum of five years and meet certain other criteria.

48.     Upon reconciliation of owner and HUD rent comparability studies, HUD will generally permit rent increases up to 150% of fair market rent and increase the federal rent subsidy to equal the difference between the current rents and the newly marked up rents.   In addition, properties eligible for the Markup-to-Market Program meeting certain additional criteria are eligible to apply to HUD for a waiver permitting rent increases which exceed 150% of fair market rents.

49.     Upon information and belief, the Project was among the Section 8 housing projects eligible to participate in the Markup-to-Market Program and was also eligible to apply for a waiver permitting rent increases in excess of 150% of fair market rents.

50.     Upon information and belief, on or about June 23, 2000, the Partnership agreed to renew its HAP Contract, and thereby became eligible to participate in the Markup-to-Market Program.

51.     Upon information and belief, prior to the Merger, the Partnership had not raised unit rents at the Project to the levels permitted under the Markup-to-Market Program.

**E.     The AIMCO Properties Loan**

52.     Upon information and belief, on or about January 1, 2001 NHP caused the Partnership to enter into the AIMCO Properties Loan, an unsecured revolving line of credit

promissory note, which assertedly evidenced loans made and/or services advanced to the Partnership.

53.     Upon information and belief, the AIMCO Properties Loan was payable, with accrued interest, upon demand of AIMCO Properties.

54.     Upon information and belief, as of January 1, 2001, the Partnership's expenses exceeded its revenues, and it was, therefore operating at a deficit.

55.     Upon information and belief, Defendants knew that the Partnership would be unable to make payments of interest or principal under the AIMCO Properties Loan unless the Partnership was able to increase its revenues; *i.e,* increase the rents received at the Project.

56.     Upon information and belief, on or about July 15, 2002, AIMCO Properties demanded that the AIMCO Properties Loan be repaid in full by September 30, 2002, at which time the balance due would have been $1,541,608.

## Facts

### A.     Terms Of The Proposed Merger

57.     By letter dated August 20, 2002, NHP advised the Beautiful Village limited partners of the proposed Merger.  The letter enclosed, among other documents, (i) the Proxy Statement; (ii) the Partnership's 2001 Audited Financial Statements; and (iii) a Private Placement Memorandum of AIMCO Properties dated November 15, 2001, which contained numerous, voluminous attachments (collectively, the "Offering Documents").

58.     The Offering Documents contemplated a reverse triangular merger, in which a transitory limited partnership, called BVRC Partners, L.P. ("BVRC") and wholly owned by AIMCO Properties, was to be formed solely for the purpose of effecting the Merger.  Upon consummation of the Merger, BVRC was to be merged with and into Beautiful Village, with Beautiful Village to be the surviving entity of the Merger.

59.     In connection with the Merger, all Partnership interests -- except those owned by AIMCO Properties -- were to be exchanged for either (i) $100 cash; or (ii) 2.5 Partnership Common Units of AIMCO Properties ("Common OP Units").

60.     AIMCO Properties' Common OP Units were valued at $41.59 per share based on the closing price on August 16, 2002 of Class A Common Stock for AIMCO, which is listed on the New York Stock Exchange.

61.     Under the terms of the Merger, "accredited investors" who were not Texas residents were permitted to choose to receive Common OP Units. Non-accredited investors and Texas residents could receive only $100 cash.

**B.     Defendants' False And Misleading Statements Concerning The Merger**

62.     The Proxy Statement sets forth the terms of the Merger, as well as other material information. The Proxy Statement is twenty-seven pages in length, single spaced, and printed in ten-point type. A true and correct copy of the Proxy Statement is attached hereto as Exhibit A.

63.     Notwithstanding its suggestion that "the information herein is correct as of August 20, 2002," the Proxy Statement contains false and misleading statements of material fact, and fails to state material facts necessary to make the statements made not misleading, with respect to, among other things, (i) the reasons for the proposed Merger; (ii) the regulatory status of the Partnership; and (iii) the value of the Beautiful Village limited partners' interests.

*i)     Reasons For The Proposed Merger*

64.     The Proxy Statement presents in a misleading manner its discussion regarding the asserted reasons for the Merger.

65.     The central reason put forth by Defendants for the Merger is the Partnership's alleged inability to support the interest payments under the AIMCO Properties Loan. The Proxy Statement asserts, among other things, that the Partnership would not be able to refinance the

AIMCO Properties Loan, and that the impending default thereunder will lead inexorably to the loss of the Partnership Property and significant adverse tax consequences.

66.     According to the Proxy Statement:

     (i)     The AIMCO Properties Loan would go into default on or before September 30, 2002;

     (ii)    AIMCO Properties would then "exercise remedies with respect to this indebtedness";

     (iii)   That such remedies "include obtaining a judgment against the Partnership and executing that judgment against the Property";

     (iv)    That "[i]n that circumstance, it is probable that the General Partner will determine the use of the Partnership's limited resources to contest such exercise of remedies likely would be futile, and the General Partner will attempt to conclude a settlement whereby the Partnership's property will be assigned to AIMCO [Properties LP], subject to the senior indebtedness secured by the Partnership's Property, in full satisfaction of the indebtedness as soon as possible"; and

     (v)     That "it is not anticipated that any proceeds would be available for distribution to the partners of the Partnership in the event of such transfer."

67.     The Proxy Statement goes on to describe various adverse tax consequences that would befall the limited partners in the event such a settlement is reached with AIMCO Properties.

68.     The net effect of these statements was to convey the message that loss of the Beautiful Village limited partners' entire investment in the Partnership was a *fait accompli,* and

that voting in favor of the Merger was the only way to preserve some economic interest and avoid tax recapture penalties.

69.    In fact, upon information and belief, the Partnership would have been able to refinance the AIMCO Properties Loan at a significantly lower rate of interest through a third party or sell the Project, thereby obviating the asserted need for the Partnership even to consider entering into the Merger.  Under either scenario, the Limited Partners and the other Beautiful Village limited partners would have received a substantially greater return for their investment than what was offered under the Merger.

70.    The Proxy Statement also fails to indicate whether the Partnership had any grounds to contest AIMCO Properties' claim or to enter into an alternative settlement arrangement with AIMCO Properties, or the potential outcomes of those courses of action.

71.    Upon information and belief, the more reasonable and prudent course of action, consistent with NHP's fiduciary obligations to the Partnership's limited partners, would have been to oppose AIMCO Properties' claims of default under the AIMCO Properties Loan and/or to propose alternative settlement arrangements, rather than go forward with the Merger.

*ii)*    ***Regulatory Status Of The Partnership***

72.    The Proxy Statement contains a section entitled "Regulatory Status" of the Partnership.

73.    In this Section, the Proxy Statement cryptically declares that "[t]he Property *may* receive the benefit of government subsidies." (Emphasis added).  It goes on to list these various federal, state, and local subsidies and explains, generically, that "these subsidies may help or hinder the economic value of the Property."

74.    The Proxy Statement, however, fails to discuss, or discusses in a misleading and confusing manner, the actual facts concerning the regulatory status of the Partnership Property.

75.     Among other things, the Proxy Statement fails:

(i)     To state clearly whether the Partnership Property is, or is not, subject to the HAP Contract;

(ii)    To discuss any of the material facts regarding the HAP Contract or the Markup-to-Market Program;

(iii)   To explain the impact of renewal of the HAP Contract and the Markup-to-Market Program on Partnership's revenue stream; or

(iv)    To explain the impact of renewal of the HAP Contract and the Markup-to-Market Program on the market value of the Partnership's Property and its ability to refinance its debt and satisfy the AIMCO Properties Loan.

76.     It was only after the Merger that the Limited Partners learned that the Partnership was eligible to participate in the Markup-to-Market Program under which the Project's rents could be renewed at rent levels equal to market rates, and how such rental increase would impact the Partnership's financial condition and the Project's market value.

77.     The Partnership's ability to increase its free cash flow through the Markup-to-Market Program was information that would be material to any limited partner making the decision whether to approve the Merger, but which Defendants failed to disclose in the Proxy Statement.

**iii)** ***Value Of The Beautiful Village Limited Partners' Interests***

78.     The Proxy Statement also contains false and misleading statements and omissions with respect to the value of the Limited Partners' limited partnership interests and the manner in which such interests were valued.

79.     In a classic smoke and mirrors presentation, the Proxy Statement purports to set forth and explain the variables, assumptions, and methodology employed by Defendants in

valuing the Property, and then proceeds to demonstrate that each limited partnership Unit assertedly has a negative value.

80.     In fact, the Proxy Statement provides no concrete factual information upon which a limited partner could reasonably be expected to determine the value of his or her limited partnership interest.

81.     For example, Defendants claim in the Proxy Statement to have considered the following in determining the consideration paid in the Merger:

(i)      "[T]he Partnership's cash and cash equivalents at June 30, 2002";

(ii)     "[T]he net present value of the Partnership's unaudited free cash flow for the six months ended June 30, 2002, annualized, through the maturity of the existing mortgage maturity [*sic*]";

(iii)    Rental payments as capped under the HAP Contracts and at fair market value;

(iv)    An appropriate discount rate; and

(v)     "[C]urrent economic conditions, recent declines in multifamily net operating income, and recent increased operating expenses."

82.     Not a single one of these pertinent figures or issues is disclosed, nor is the valuation methodology explained in the Proxy Statement.

83.     The Proxy Statement expressly declares that "the consideration offered in the Merger is equivalent to our estimate of the value of the Partnership." According to the Proxy Statement, the Partnership valuation is a negative number (($1,697,908)), and the corresponding value of each Partnership Unit is zero.

84.     Plaintiff believes, and therefore avers, that the value of the Limited Partners' Partnership Units as measured under any reasonable standard was substantially greater than the value suggested by Defendants in the Proxy Statement.

85.     Defendants made the false and misleading misstatements in the Proxy Statement intentionally, with knowledge of their falsity, or with reckless disregard for their truth, and with the intent to create in the minds of the Partnerships' limited partners the impression that their interests in the Partnerships were worthless, and that the Merger was the only reasonable option available to them.

**C.    Consummation Of The Merger**

86.     In reasonable reliance upon the representations made in the Proxy Statement, caused certain Limited Partners to vote in favor of the proposed Merger.  Upon approval of the merger by at least 51% of the limited partnership interests, those Limited Partners who did not vote in favor of the merger were forced to accept the terms of the merger.

87.     Upon information and belief, the Merger was consummated, with the Limited Partners receiving consideration of either 2.5 Common OP Units or $100 cash in exchange for each of their respective Beautiful Village Units.

88.     Upon information and belief, Defendants, having acquired control of the Partnership through the Merger, now intend to sell the Project for a substantial profit and/or significantly increase Project rents under the Markup-to-Market Program.

89.     Upon information and belief, such price will produce a return per Partnership Units that is significantly greater than what the Limited Partners received for their Partnership Units under the Merger.

## COUNT I

### Violation of Section 10(b) of the Exchange
### Act and Rule 10b-5 Thereunder
### (Against All Defendants)

90.     Plaintiff incorporates by reference, as if set forth at length herein, each and every

allegation of paragraphs 1 through 89 of this Complaint.

91.     In connection with the Merger, Defendants used the means of interstate

commerce, including the mails and telephone system.

92.     The exchange of AIMCO Properties' Common OP Units for the Limited Partners'

limited partnership interests constitutes a purchase or sale of securities.

93.     In connection with each such purchase or sale of securities, Defendants made

false, material misrepresentations and omitted to disclose material information in the Proxy

Statement.

94.     Each Defendant participated in the making of such false and misleading

statements and/or was under a duty to disclose facts to the Limited Partners.

95.     Defendants' material misrepresentations and omissions were made with scienter

in that they were made actual knowledge of their falsity and/or misleading nature or with

reckless disregard for their truth.

96.     Defendants intended to deceive, manipulate and defraud the Limited Partners by

causing them to believe that their respective limited partnership interests had no value and that

there was no economically viable alternative to the Merger, so as to induce them to vote in favor

of the Merger, thereby allowing Defendants to acquire the Limited Partners' limited partnership

interests for less than fair value and to gain ownership of and control over the Partnership

Property.

97.     Those Limited Partners who voted in favor of the merger reasonably relied upon the material misstatements and omissions contained in the Proxy Statement in making their decision to vote in favor of the Merger and sell their limited partnership interests to the Defendants.  Upon approval of the merger by at least 51% of the limited partnership interests, those Limited Partners who did not vote in favor of the merger were forced to accept the terms of the merger.

98.     The Limited Partners were proximately harmed by the Defendants' material misrepresentations, in that the false and misleading statements and omissions contained in the Proxy Statement induced them to vote in favor the Merger and sell their limited partnership interests to the Defendants, resulting in injury and damages.

## COUNT II

### Control Person Liability Pursuant to Section 20(a) of the Exchange Act
### (Against Defendants AIMCO and  AIMCO Properties)

99.     Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 98 of this Complaint

100.    At all times relevant herein, Defendants AIMCO and AIMCO Properties acted as controlling persons of NHP within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their ownership, control of, direction of, participation in, and or awareness of NHP's operations, and/or their knowledge of the false and misleading statements made by NHP, AIMCO and AIMCO Properties had the power to influence and control, and did influence and control, directly or indirectly, NHP's activities, including the dissemination of the false and misleading statements.

101.    As set forth above, NHP violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, AIMCO and AIMCO Properties are liable pursuant to Section 20(a) of the Exchange Act.

102.    The Limited Partners were proximately harmed by NHP's material misrepresentations, in that the false and misleading statements and omissions contained in the Proxy Statement induced them to vote in favor the Merger and sell their limited partnership interests to the Defendants, resulting in injury and damages.

## COUNT III

### Rescission Pursuant to Section 29(b) of the Exchange Act
### (Against AIMCO Properties)

103.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 102 of this Complaint.

104.    The Limited Partners are within the class of persons that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j, and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, seek to protect.

105.    The Limited Partners and AIMCO Properties are in contractual privity on account of the Merger agreement.

106.    The Limited Partners are innocent parties to a contract with AIMCO Properties that was made and performed in violation Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, in the ways specified *supra*.

107.    Pursuant to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78cc(b), the Limited Partners are entitled to rescission of the exchange of their Units of Partnership interest for Common OP Units.

## COUNT IV

### Fraud and Misrepresentation
### (Against All Defendants)

108.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 107 of this Complaint.

109.    Defendants made affirmative misrepresentations of material fact in the Proxy Statement and/or omitted statements that would otherwise have made the statements made therein not misleading

110.    At the time when the statements in the Proxy Statement were made, Defendants knew that they were false and/or misleading.

111.    Defendants' misrepresentations and omissions in the Proxy Statement were made for the purpose of inducing the Limited Partners to sell their interests in the Partnership at a price that was substantially less than their fair value and enriching themselves at the expense of the Limited Partners.

112.    Those Limited Partners who voted in favor of the merger justifiably relied to their detriment upon the statements made in the Proxy Statement in making their decision to vote ni favor of the merger and sell their interests in the Partnership.  Upon approval of the merger by at least 51% of the limited partnership interests, those Limited Partners who did not vote in favor of the merger were forced to accept the terms of the merger

113.    The Limited Partners have suffered losses and damages as a proximate result of Defendants' misrepresentation and fraud.

114.    Defendants' fraud and misrepresentation in connection with the Merger was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Limited Partners.

## COUNT V

### Breach of Fiduciary Duty
### (Against NHP)

115.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 114 of this Complaint.

116.    At all relevant times, NHP, as the Partnership's General Partner, stood in a fiduciary relationship with respect to the Partnership and its limited partners.

117.    In its capacity as a fiduciary, NHP owed a duty of utmost good faith, fairness, and loyalty toward the Partnership and its limited partners.

118.    NHP's fiduciary duties toward the Limited Partners included the obligation (i) to make full disclosure of all material information; (ii) to refrain from self-dealing and reaping an individual profit not shared with the other partners in connection with a transaction relating to the Partnership, whether directly or indirectly through an affiliate; and (iii) to manage the affairs of the Partnership with skill, prudence, and judgment.

119.    NHP breached its fiduciary duties to the Limited Partners by, among other things, (i) failing to increase rents to the levels permitted by HUD after the Project became eligible to participate in the Markup-to-Market Program; (ii) presenting false and misleading statements of material fact and omitting material facts in the Proxy Statement concerning the alleged reasons for the Merger, the regulatory status of the Partnership, the valuation of the Limited Partners' interests in the Partnerships, and the fairness of the terms of the Merger; (iii) failing to advise the Limited Partners that the offering price for Units of Partnership in the Merger was inadequate and unfair; (iv) inducing the Limited Partners to tender their interests in the Partnerships to NHP's affiliate, AIMCO Properties, at a grossly unfair price; and (v) failing to ensure that the Limited Partners received fair value for their interests in the Partnerships.

120.    The Limited Partners suffered losses and damages as a result of NHP's breach of its fiduciary duties.

121.    NHP's conduct in breach of its fiduciary duty was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Partnership or its other partners.

## COUNT VI

### Negligent Misrepresentation
### (Against All Defendants)

122.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 121 of this Complaint.

123.    Defendants made affirmative representations of fact in the Proxy Statement and/or omitted statements that would otherwise have made the statements made therein not misleading.

124.    Defendants knew or should have known that their representations in the Proxy Statement were false and/or that the Proxy Statement omitted statements that would otherwise have made the statements made therein not misleading.

125.    A reasonable person would have considered the representations made in the Proxy Statement to be material to their decision whether to vote in favor of the Merger.

126.    Those Limited Partners who voted in favor of the merger justifiably relied to their detriment upon the statements made in the Proxy Statement in making their decision to vote in favor of the merger and transfer their interests in the Partnership.  Upon approval of the merger by at least 51% of the limited partnership interests, those Limited Partners who did not vote in favor of the merger were forced to accept the terms of the merger.

127.    The Limited Partners have suffered losses and damages as a proximate result of Defendants' misrepresentation and fraud.

## COUNT VII

### Breach of Contract
### (Against NHP)

128.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 128 of this Complaint.

129.    Under the terms of the Limited Partnership Agreement, NHP was charged with both the right and the obligation to manage and operate the business of the Partnership to the advantage of all partners, including the Limited Partners.

130.    The Limited Partners performed all of their respective obligations under the Limited Partnership Agreement.

131.    NHP beached it obligations under the Limited Partnership Agreement by, among other things, (i) failing to increase rents to the levels permitted by HUD after the Project became eligible to participate in the Markup-to-Market Program; (ii) presenting false and misleading statements of material fact and omitting material facts in the Proxy Statement concerning the alleged reasons for the Merger, the regulatory status of the Partnership, the valuation of the Limited Partners' interests in the Partnerships, and the fairness of the terms of the Merger; (iii) failing to advise the Limited Partners that the offering price for Units of Partnership in the Merger was inadequate and unfair; (iv) inducing the Limited Partners to tender their interests in the Partnerships to NHP's affiliate, AIMCO Properties, at a grossly unfair price; (v) failing to ensure that the Limited Partners received fair value for their interests in the Partnerships; and (vi) failing to ensure that the Merger was made  "on terms reasonably competitive with those which may be obtained from unaffiliated persons"

132.    The Limited Partners have suffered losses and damages as a result of NHP's breach of the Limited Partnership Agreement.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty
### <u>(Against AIMCO Properties and AIMCO)</u>

133.    Plaintiff incorporates by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 132 of this Complaint.

134.    NHP has breached its fiduciary obligations to the Limited Partners by, among other things, (i) failing to increase rents to levels equal to market rates after the Project became eligible to participate in the Markup-to-Market Program; (ii) presenting false and misleading statements of material fact and omitting material facts in the Proxy Statement concerning the alleged reasons for the Merger, the regulatory status of the Partnership, the valuation of the Limited Partners' interests in the Partnerships, and the fairness of the terms of the Merger; (iii) failing to advise the Limited Partners that the offering price for Units of Partnership in the Merger was inadequate and unfair; (iv) inducing the Limited Partners to tender their interests in the Partnerships to NHP's affiliate, AIMCO Properties, at a grossly unfair price; and (v) failing to ensure that the Limited Partners received fair value for their interests in the Partnerships.

135.    Through their ownership and control of NHP, AIMCO Properties and AIMCO had actual knowledge of NHP's breach of its fiduciary obligations to the Limited Partners.

136.    AIMCO Properties and AIMCO knowingly induced, participated, and substantially assisted in NHP's breach of its fiduciary obligations of the Limited Partners.

137.    the Limited Partners have suffered losses and damages as a result of NHP's breach of its fiduciary duty.

138.    The conduct of AIMCO Properties and AIMCO in aiding and abetting NHP's breach of its fiduciary duty was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Limited Partners.

### Demand for Relief

WHEREFORE, Plaintiffs, as successor in interest to the Limited Partners, respectfully requests that this Court enter judgment in its favor and against Defendants National Housing Partnership ("NHP"), AIMCO Properties, L.P. ("AIMCO Properties") and Apartment And Investment Management Company ("AIMCO"), jointly and severally, as follows:

1.      On Count One, ordering rescission of the Merger agreement between the Limited Partners and AIMCO Properties and/or awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

2.      On Count Two, awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

2.      On Count Three, ordering rescission of the Merger agreement between the Limited Partners and AIMCO Properties, plus interest, costs, and such other and further relief as this Court deems just and proper.

3.      On Count Four, awarding damages, including punitive damages, in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

4.      On Count Five, awarding damages, including punitive damages, in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper, including, without limitation, the removal of NHP as General Partner of the Partnership.

5.      On Count Six, awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

6.     On Count Seven, awarding damages, including punitive damages, in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

7.     On Count Eight, awarding damages, including punitive damages, in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        May 13, 2005

                                        Respectfully submitted,

                                        HERRICK, FEINSTEIN LLP


                                        _____
                                        John R. Goldman (JG-4550)
                                        Grant R. Cornehls (GC-6123)
                                        2 Park Avenue
                                        New York, New York 10016
                                        Attorneys for Plaintiffs